IN RE STONE.

(Filed 6 November, 1918.)

1. **Courts—Justices of the Peace—Appeal—Superior Courts—Jurisdiction.**

   On an appeal from an order of the clerk of the Superior Court allowing compensation to attorneys employed by the next friend of an infant in his successful action against the guardian for wrongful conversion of the property to his own use, the Superior Court acquires jurisdiction, and may hear and determine the matter *de novo* as if originally begun there, though the jurisdiction may have been erroneously assumed by the clerk.

2. **Courts—Jurisdiction—Custody of Funds—Guardian and Ward—Attorneys and Client—Attorneys' Fees—Costs.**

   Where the judgment in an action by a ward against his guardian has been rendered in the Superior Court in favor of the ward, and the court has taxed the entire estate with the cost, including a fee to the attorneys employed by the next friend under authority of court, but reserving the amount for further determination, upon motion made by the attorneys at a subsequent term of the court, an order was promptly entered fixing the amount of such compensation, the court having retained not only the cause, but the control of the funds.

3. **Guardian and Ward— Attorney and Client— Attorneys' Fees— Amount— Courts—Contracts.**

   Where it is proper for the attorneys for a ward, employed by the next friend, to receive compensation out of the estate for the prosecution of an action against the guardian, the amount is for the sole determination of

the court, irrespective of any contract that may have been made, to be fixed with regard to the value of the services in relation to that of the estate; and under the circumstances of this case, the Supreme Court, on appeal, reduced the amount, fixed by the Superior Court judge, from $1,000 to $500.

**4. Appeal and Error—Attorney and Client—Attorneys' Fees—Guardian and Ward—Costs.**

In this case the attorneys for the ward successfully prosecuted his action against his guardian, and the Superior Court judge properly allowed them a fee, but in double amount of that finally allowed on appeal by the guardian: *Held*, one-half the costs on appeal were taxable against the guardian individually and the other against the attorneys.

CLARK, C. J., dissents.

THIS is a proceeding before the Clerk of the Superior Court of Wake County begun by R. W. Winston, J. Crawford Biggs, and Moses N. Amis to have an allowance of attorneys' fees made to them for services rendered to Thomas S. Stone, a minor, in a civil action entitled *In re Stone,* 173 N. C., 280. From the order of the clerk allowing the sum of $650, Mrs. Carey W. Stone appealed to the Superior Court. The matter was heard by *Stacy, J.,* at June Term, 1918, of Wake Superior Court, who made an order allowing counsel one thousand dollars and directing that Mrs. Stone pay said sum into court for their use. From such order Mrs. Stone appealed.

*Douglass & Douglass and Murray Allen for appellant.*
*W. L. Watson, M. N. Amis, R. W. Winston, and J. C. Biggs for appellees.*

BROWN, J. It is contended that the Superior Court acquired no jurisdiction to make such order in the original case of *In re Stone* because the proceeding was erroneously commenced before the clerk, who had no jurisdiction. When the matter reached the Superior Court by appeal the judge had the right under the statute to assume jurisdiction and dispose of the case as if originally begun there. Clark's Code, sec. 255 (3d Ed.); *Roseman v. Roseman,* 127 N. C., 497, and cases cited.

The case of *In re Stone* was still pending in the Superior Court by virtue of the decree of *Bond, J.,* who tried it at October Term, 1916, as follows:

"It is further ordered, adjudged and decreed that the said Carey W. Stone, as administratrix and guardian, render an account to the Clerk of the Superior Court of Wake County on the sum of $6,500 received by her for the use of the said infant, Thomas S. Stone; that she give the bond in double the said amount as guardian of the said infant, as required by law, and that she be allowed until the first day of December to give said bond in the penal sum of $13,000.

22—176

IN RE STONE.

"It is further ordered and adjudged that the said Carey W. Stone, guardian, pay the costs of this action out of the entire fund; and it appearing that notice of appeal to the Supreme Court has been given herein, the amount of attorneys' fees to be paid to the attorneys representing the next friend in the protection of the estate of said infant is reserved for the future determination of this court, to be taxed against the fund belonging to said infant."

By reason of that decree the Superior Court retained its control over the case, and when the appeal from the clerk came before *Judge Stacy* he had jurisdiction to hear the matter *de novo* and to treat it as a motion in the original cause.

The facts are that Mrs. Stone, as administratrix, recovered $10,000 for the negligent killing of her husband. A controversy arose between her and her only child as to the division of this fund. In that action E. P. Stone, uncle of Thomas S. Stone, the infant, was appointed next friend by the court to protect the interests of the infant. In order to do so, he employed counsel to appear in the cause, which they successfully prosecuted to this Court, and thence followed it to the Supreme Court of the United States. Under the final judgment, they recovered for the infant $6,500.

We are of opinion that the Superior Court retained jurisdiction of the cause and control of the fund, and that the judge had authority to make the order. It was peculiarly his duty to make the allowance under the circumstances of this case, as the next friend had been directed to employ counsel and the infant's mother and guardian were hostile to them.

The *prochein ami,* or next friend, is appointed by the court to protect the infant's rights. It is essential that he have the assistance of counsel learned in the law. The infant has no power to contract as to fees, and in most cases is too young to understand such matters. Referring to the duty of the court in respect to infants, in *Tate v. Mott,* 96 N. C., 23, *Judge Merrimon* says: "The infant is in an important sense under the protection of the court; it is careful of his rights, and will in a proper case interfere in his behalf and take, and direct to be taken, all proper steps in the course of the action for the protection of his rights and interests."

It would be very singular that the Courts should assume the duty of seeing that all steps are taken to protect the infant's rights and yet deny to themselves the power to compel the payment of the necessary expenses out of the infant's estate recovered in the cause.

While the next friend has power to employ counsel to prosecute the action, and it is his duty to do so, he cannot make a binding contract for compensation. *Honck v. Bridwell,* 28 Mo. App., 644. The court

may fix the attorneys' compensation without regard to any contract. 14 Ency. P. & P., 1037, and cases cited; *Cole v. Superior Court,* 63 Cal., 87.

In this case the Supreme Court of California says: "An attorney accepting employment and rendering services under such circumstances must rely upon the subsequent action of the court in ascertaining and adjudging proper compensation. . . . There is no place here for the doctrine of an implied promise upon a *quantum meruit.* . . . The attorney performing legal services for the infant aids the court in carrying out its duty of protection. He is not only an officer of the court in a general sense, but is the special agent through which the court acts."

The Court further says: "The statute being silent as to the tribunal which is to fix the compensation, it seems to reasonably follow that the court placing him in position and making use of his services would have the fixing of the compensation of the attorney employed."

The case of *Outland v. Outland,* 118 N. C., 141, is direct authority. In that case Thomas Outlaw, *non compos mentis,* brought action by his next friend to subject land to a lien for a legacy devised by his father. The next friend employed counsel. The plaintiff was successful in charging the land with the legacy. Counsel was allowed $200 by the Superior Court. In reviewing the matter, the Supreme Court said: "We think the allowance of $200 as an attorney's fee in this case is too much and it is reduced to $100." The Court passed on the allowance and reduced it and allowed the amount that seemed just. See, also, *Graham v. Carr,* 133 N. C., 458. We think our position is sustained also by the following additional cases: *Colgate v. Colgate,* 23 N. J. Eq., 373; *Richardson v. Tyson,* 110 Wis., 572; *Smith v. Smith,* 69 Ill., 313. We do not question the authority of such cases as *Mordecai v. Devereux* and *Patterson v. Miller.*

The question involved in this case was not presented in those cases. There was no next friend in either of those cases and no attorneys representing infants by direction of the court. In this case the Superior Court did not interfere between attorney and client. The attorney was not employed by the infant, but by direction of the court, and acted under its control. To our minds, it would be extremely unfortunate to the cause of infants generally to hold that the court has no power to reward the attorney out of the estate recovered.

Coming now to the matter of compensation, we concur with the Illinois Court in *Smith v. Smith, supra,* that "Courts have no right to be prodigal with the means of their wards; and whilst they should make just allowances, they are bound to see that their funds are protected."

Attorneys, being officers of the court, are sometimes compelled to

render laborious service for no fee, and to the credit of the legal profession be it said such service is rendered most willingly. When serving under the direction of the court to protect the rights of an infant, their compensation is to be measured by the standard of official emoluments .rather than by that of the prices demanded and paid between individuals free to contract at will.

In this case, the services rendered by the able counsel who represented the infant were undoubtedly ·valuable and attended with expense, and have so far been unrewarded. The case was argued before this Court and the Supreme Court of the United States; but it is not altogether a question as to what their services are worth; so much as it is, what is the infant's estate able to pay? Measured by that standard, we feel it our duty to reduce the sum allowed to $500.

With that modification, the order of *Stacy, J.,* is affirmed.

The costs of this Court will be taxed against Mrs. Carey W. Stone individually, one-half and the other half against Winston, Biggs, and Amis.

Affirmed.

CLARK, C. J., dissenting: It appears from the record in this case that at no time has there been any fund in court. At no time has one cent of the $1,000 which the plaintiffs ask the court to order the guardian to pay them been in the control of any court or in the custody of any of its agents. This appears by the records of the proceeding. The very motion by which the plaintiffs ask that the court appropriate $1,000 of the ward's money for the payment of their fees specifies that it is in the custody of the guardian (his mother), and asks that she "be ordered to *pay the same into court.*" Such order would not be necessary if the fund were already in court.

The record shows that the defendant guardian, as administratrix of her deceased husband, received $10,500 on 10. November, 1915, by a compromise in an action against the Seaboard Air Line Railroad Company for the wrongful death of her husband. Not one cent of that money has ever been a "fund in court" or subject to the control of any court. On 24 May, 1915, she applied for and was appointed guardian of her son, her only child, who resides with her, and gave bond 1 December, 1916, as directed, in the sum of $13,000 for the custody of the $6,500 belonging to her son. That fund was invested in real estate and has been in her custody and control as guardian from that hour to this. Of the $10,500 collected as above, she paid out $750 counsel fees—*i. e.,* $250 for collecting her one-third and $500 for collecting her son's two-thirds, leaving in her hands $6,500 as guardian.

· On 2 July, 1916, more than a year after her appointment as guardian, the clerk, by a citation *ex mero motu,* notified her, as administratrix,

to render an account of this and the other funds in her hands, and in passing upon such account directed her to hold the $6,500 as guardian for her son, being two-thirds of the net fund after payment of counsel fees. In her answer, under the advice of her counsel, she pleaded, as appears in the record, that she did not claim to hold the money of her son as her own, but that she held it as trustee for him under the Federal Liability Act, and not as guardian, and appealed from the order of the clerk, but the order was affirmed by the judge and by this Court and an attempted writ of error by her counsel to the United States Supreme Court was dismissed summarily for want of jurisdiction and without hearing any argument from these plaintiffs. For this the estate of the boy is now asked to be taxed by the court in the sum of $1,000 for counsel fees; and by as much right, there may be the same motion to tax his estate $1,000 for counsel fees for the guardian in resisting the motion. The next friend was not appointed till 16 September, 1916, after the matter had gotten into the Superior Court.

This proceeding to assess and recover lawyers' fees against the guardian, who has her ward's estates in hand by a mere motion, is entirely without precedent in this State, and there is no statute to authorize this. The motion seeks to recover out of the guardian legal fees for services rendered the ward when there is no fund in court, nor has been. It is in effect an action, though begun by a motion and not by a summons, alleging services rendered the ward when there has been no attempt to agree with the guardian as to the value of the services rendered, and without submitting it, as all questions as to the value of services rendered must be submitted, to a jury.

The clerk can audit her account, but could not, as here attempted, adjudge any indebtedness and order the guardian to pay it. Nor can the Superior Court do so except by judgment rendered in an action against her regularly begun by summons; nor has this Court jurisdiction, for no fund is in this Court; nor have we jurisdiction by appeal of a matter of which the court below had no jurisdiction. We are "No judges of such matters." Acts xviii, 15. The idea of the plaintiffs—or petitioners, whichever they may be, for the proceeding is anomalous—seems to be that the clerk, or their brother lawyers on the bench, would be better informed as to the value of their services and would, therefore, be more liberal in fixing the amount of their compensation than a jury. But if such practice is to be begun now, it will be created by "judicial legislation," for there is no statute and no precedent for the court to fix the value of a lawyer's services and ordering a guardian or administrator to "pay the money into court" any more than for a doctor's services or a grocer's bill. If such practice is now to be inaugurated, it is apprehended that it will become a most serious embarrassment to the judges

to be called upon to fix the fees of counsel in every case where the party for whom the services were rendered happens to be a minor who has a guardian, or is an administrator or executor, with whom counsel fail to agree as to the value of the services rendered. If the fees of counsel can be adjusted by this short-hand process of application to the court in this case it can be done in all such cases.

In this instance, the plaintiffs, or petitioners (whichever they should be styled) ask the approval of a fee of $1,000 and its payment by the guardian for representing the interest of the ward. She is the mother as well as the guardian of her son's estate and is seeking to protect that fund in her hands from what she deems an excessive charge. If allowed, there will be equal ground for the counsel of the guardian to apply for $1,000 to be allowed him for the same service, for the court cannot adjudge that there was not equal ability and service on each side. If the guardian shall be ordered to pay $1,000 fee out of the ward's fund to plaintiffs for seeking to have the $10,500 fund (received for his father's death) apportioned in a certain way, the counsel on the other side is equally entitled to $1,000 for aiding the guardian to resist the apportionment. Then there will come, with as much reason, an application to allow fees to counsel on either side for making and opposing this motion to allow the $1,000 fees to each side.

What has been said so far is in reply to the claim made that there has been a fund in court, when the record shows that at no time has there been any fund in the custody of the court. But taking it to be true that there was such fund in court, this motion is contrary to all the precedents in this Court, which are that the Court cannot fix the fees of counsel if there is objection. The duty of the Court is to conserve any fund in its hands, and not to divide it out among counsel whose views in regard to the value of their services may, as in this case, be in excess of what the guardian or trustee may think just. In such cases counsel must come to an agreement with the guardian, subject, of course, to the power of the clerk to cut down the amount, though agreed on, in passing upon the account of the guardian or administrator.

The guardian alleges: (1) That the court had no jurisdiction because the fund is not in the hands of the court. (2) That the counsel should adjust the amount of the fee by agreement with the guardian, subject to exception and review by the court in passing upon her accounts as guardian. (3) And that if the guardian does not allow counsel what they deem a sufficient sum, their remedy is by action on a *quantum meruit,* in which action the amount will be settled as in all other disputes between client and counsel when no sum has been agreed upon, by the verdict of a jury. (4) She further urges that the amount allowed,

both by the clerk, and still more by the judge, is excessive for services rendered in merely having the ward's share in the fund adjudged.

According to the precedents in our Courts, the judgment of the court was without jurisdiction. The fund is not in the hands of the court, and, therefore, on that ground, of itself, the proceeding should be dismissed. But even had there been a fund in court, the judge had no power to fix the fees of counsel when the guardian charged by his oath and bond with the custody and safe-keeping of the ward's estate objects to the amount.

In *Mordecai v. Devereux,* 74 N. C., 673, this Court said: "The question is decided. *Patterson v. Miller,* 72 N. C., 516. This Court has never interfered between attorney and client in making allowances for professional services, and we are not inclined at this late day to assume the power to do so. We make allowances to the clerk for stating an account, or to a commissioner for making a sale, on the ground that the work is done by order of the Court. We have never supposed that we could be called on to settle fees between client and attorney, although there be a fund in the keeping of the Court."

In that case a large fund was in court, and the trustees and commissioner, one of whom was this writer, applied to the court to fix the fees of counsel, there being a very large number of creditors whom it was impossible to consult, many of them being minors and married women, and some of them might be dissatisfied with the allowance to counsel.

In the present case, the guardian having an adversary interest, it was proper and indeed according to the practice of the Courts and necessary that the ward should be represented by a next friend, who had no authority to make a special contract as to the amount of the fee. But none the less, the services were rendered for the ward's estate and the guardian should allow a reasonable and just fee for such services. This would be a proper charge against the estate of the ward in her hands, and she has no pecuniary interest herself against the allowance of a proper fee. If she refuses reasonable compensation, counsel must proceed by action against the guardian as custodian of the ward's estate.

In *Gay v. Davis,* 107 N. C., 269, it was held that the Court "Has no authority to determine what compensation counsel shall demand or ought to have." To same effect, *R. R. v. Goodwin,* 110 N. C., 175.

In *Loven v. Parsons,* 127 N. C., 302, the Court says: "Certainly all just and proper disbursements for counsel fees by the collector can be proved against the estate and recovered against the administrator if he refuses to pay; but this must be done in the proper legal method and *forum,* the administrator having his day in court and an opportunity to contest the necessity or validity or the amount of such disbursements."

It is true that when a trustee finds it necessary to employ counsel in

the management of an estate under the control of the court, his reasonable disbursements for counsel are allowed out of the trust fund upon the settlement of his account, but this is to be done just in the same way that reasonable counsel fees paid by a guardian, administrator or executor are allowed in the settlement of the estate. *Whitford v. Foy,* 65 N. C., 276; *Young v. Kennedy,* 15 N. C., 267. In such cases, as was said by the Court in *Mordecai v. Devereux, supra,* the trustee must make the allowance, subject to have the amount surcharged in his settlement if, on objection, it is found to be excessive. But this does not authorize a court to make such allowance when it is opposed by the guardian or personal representative. The court cannot create a debt against the estate.

In *Lindsey v. Darden,* 124 N. C., 308, the Court says: "If an administrator employ counsel to assist him in his administration, the contract is personal and is not a debt against the intestate's estate. The administrator must pay it, and if the disbursement is proper it will be allowed him in the settlement of his account with his estate."

The court allows fees to referees, to surveyors, to experts, to commissioners as a part of the costs, both because such services are rendered by them as agents of the court and there are statutes expressly authorizing it; but counsel are the agents and representatives of the parties and must be paid if, as in this case, there is (and could be) no special contract upon a *quantum meruit* to be agreed upon with the guardian or ascertained as in all other cases by an action for services rendered. When services have been rendered an executor, administrator, guardian, or trustee, and he pays for the same, he is allowed for the disbursement upon the settlement of his account if not found to be excessive, but the court cannot intervene and by a short-hand process fix the fees for legal services and require a personal representative or guardian to pay counsel, upon motion, any more than it could fix the fees of a doctor or a mechanic, or for any other service to the estate, and direct payment.

In some jurisdictions, where the statute, unlike ours, allows the courts to fix the fees for counsel in certain specified cases without the intervention of a jury, the resulting scandal and charges of favoritism on the part of judges to counsel alleged to be favorites have not been edifying. In this State our statutes have left no opening for such charges. It would be a most unenviable duty if the judges were charged with fixing the amount of fees for their brethren of the bar in cases of difference between them and their clients, and if they can do so between a guardian and counsel they have the same power and duty between counsel and any other client.

In England, where the legal profession is divided into barristers who address the juries and courts and attorneys who prepare the briefs of

facts and of the law, draw and file the pleadings, and perform similar services, the fees of attorneys are prescribed for every act, as are those of our clerks and sheriffs, and taxed in the costs. On the other hand, the barrister's compensation is considered an *honorarium*, and is usually paid in advance, and when it is not he cannot recover by action for his services. The attorney's fees thus taxed as a part of the costs subjected the losing party to imprisonment for nonpayment; and if not then paid, the winning party was liable to imprisonment for nonpayment of his own costs. The result was the encouragement of much litigation "on spec" (as it was called), and sometimes the imprisonment of clients on both sides, as graphically depicted by Charles Dickens in his memorable description of the Fleet Prison and the imprisonment of both suitors in "Pickwick Papers."

In North Carolina, the fees of attorneys were taxed as part of the costs, ranging from $2 to $20 in each case—*i. e.*, $20 in a suit in equity, $10 in the Supreme Court, $10 in the Superior Court where the title of land came in question, and in all other cases in that court $4, and the county court $2. Revised Code (1854), ch. 202, sec. 16; Revised Statutes (1836), ch. 105, sec. 16; Modified Batt. Rev. (1875), ch. 105, sec. 29. And, of course, suitors could be imprisoned for nonpayment thereof till 1868, when imprisonment for debt was abolished. On the other hand, lawyers were subjected to payment of all costs when an action was dismissed for failure to file the complaint in time, and to double damages for all injuries caused by fraudulent practices. Rev. Code, ch. 9, secs. 5 and 6; Batt. Rev., ch. 7, secs. 5 and 6. Lawyers' fees had no other recognition in this State or priority over any other debt beyond this, and this was expressly repealed by ch. 41, Laws 1879, which provided: "Clerks of the Supreme and Superior courts shall not include or charge in any bill of costs any attorney's fees in any civil suit hereafter determined in any court of the State, and all laws or parts of laws coming in conflict and within the meaning and purview of this act be and they are hereby repealed." *Clifton v. Wynne*, 81 N. C., 160. Since then the fees of counsel are on the same basis as any other indebtedness, without lien and without official recognition beyond the fact that when rendered to a personal representative, guardian or trustee, the amount of such fee is subject to review by the clerk of the Superior Court, or the court having charge of the fund, in passing upon the accounts of the personal representative, guardian or trustee, especially if objection is made by the parties in interest. There is no lien or other preference given a lawyer's fee even when the fee is charged for collection of that very fund, in the absence of an agreement by the client for payment out of the fund. *Bank v. O'Brien*, 175 N. C., 338.

In the action to recover the $10,500 for the wrongful death, the ad-

ministrator paid counsel $750, of which $500 has already been deducted from the two-thirds of the fund ($7,000), which was the child's two-thirds, leaving it $6,500. It is now sought to take another $1,000 out of this child's $6,500, which is held by the guardian under an oath and with the security of a bond for its safe-keeping, without its being allowed by the guardian and without the constitutional guarantee, both by the State and Federal Constitutions, of trial by jury to fix the value of the services for which the debt is claimed. Besides, fees must then be allowed counsel on the other side; and the ward's estate must be taxed by the same right for counsel fees on this motion.

This little child, 11 years old, could make no contract for lawyer's services any more than it could with a doctor for saving its life and nursing it back to health, or for necessary clothing from a merchant, nor for a board bill, nor for groceries to live upon. In such cases, if it has property, a guardian is appointed for its safe-keeping and the bill should be presented to that guardian for all services for the benefit of the ward, and is paid, subject to the approval of the clerk in passing upon the guardian's accounts. If not allowed by the guardian, the amount must be settled in an action between the claimant and the guardian.

A lawyer is not in a privileged class that exempts him from the requirement that like the doctor, or merchant, or grocer, he must prove the value of his claim to the satisfaction of a jury. The fact that the judge is a lawyer gives the claimant for legal services no short-hand process to have the value of his services assessed in any other way than is required for the doctor, the grocer, or any other creditor. Doubtless, in practice, judges may have sometimes fixed such fees, but not when, as here, the guardian has demanded a jury trial.

The sole, solitary case in our Reports which is relied on as a precedent that the courts in this State have allowed counsel fees is *Outland v. Outland,* 118 N. C., 131, where the land of an idiot was sold and, he having no guardian, the money was paid into court. The court allowed $200 lawyers' fees, and though the idiot could not object, this Court cut it down to $100 and cited as authority for allowing even that amount *Moore v. Shields,* 69 N. C., 50, which held that a guardian could be allowed by the clerk, in approving his accounts, a reasonable fee ($50) paid by him to his counsel for defending an action brought by the ward against him for a final settlement of his accounts.

In this case there has been no fund in court, and the ward has a guardian who is seeking to protect his estate from what she deems an excessive charge for legal services. She is the child's mother as well as guardian, and is asking that the value of the legal services rendered shall be submitted to a jury, and not to a judge. It does not matter whether the child had any guardian at the time services were rendered, or that

they were rendered at the request of a former guardian, or, as in this case, of a next friend, for the indebtedness is against the estate and to be allowed or disallowed by the guardian, who has the ward's property in hand at the time the claim is presented for payment.

The courts, since it was first held in *Marbury v. Madison* in 1803 that they could do so, have set aside acts of Congress and of the legislatures as unconstitutional, though the members of those bodies have been men of ability and under the same duty to observe the Constitution as the courts. The courts have also held unconstitutional acts of the Executive Department. They have not only held that the other two departments of the government have often acted in violation of the Constitution, but they have held that the courts themselves have acted unconstitutionally, not only when a higher Court reverses a lower upon a constitutional question, but by overruling their own decisions. For instance, the United States Supreme Court for a long series of years held that a corporation was not a citizen entitled to the removal of a cause on the ground of citizenship, and then reversed that ruling and held that it was. The same high Court held that the Legal Tender Act was constitutional, and then that it was not. It held, for a hundred years, that the income tax was constitutional, and then that it was not, which last ruling was reversed by the people (after twenty years delay by the plutocracy) by prohibiting the Court from following the latter decision, which action alone of the people has made it possible for this country to carry on the present great war. Then the Court held in the *Lockner case* that it was unconstitutional to restrict the hours of labor working in 120 degrees temperature to ten hours, and they have reversed this by holding valid the Adamson Law, which limits to eight hours the labor of railroad employees; and there are many other cases. In our own State, in 1833, it was held by a very able Court, in *Hoke v. Henderson,* 15 N. C., 1, that an incumbent had a right of property in his office, and that though it had been created by the Legislature, that body could not change the term of an office from life tenure to a term of years, and from being appointive to be elective by the people. That opinion, though approved by the Court in more than sixty cases, was at last overruled and set aside as unconstitutional in *Mial v. Ellington,* 134 N. C., 131. In each of these, and in other cases, the Court in the later opinions necessarily held (when the first decision ruled an act was unconstitutional) that the prior decision was unconstitutional. Therefore, with the most respectful regard for the opinion of my brethren, but in compliance with my duty as I see it, I believe that the "judicial legislation" by which the Court now for the first time, and without statute and contrary to the precedents above cited, has conferred the power on the clerk, or the Superior Court judge,

and on this Court, to fix the value of the services of counsel is in viola-
tion of the Constitution—and this on two grounds:

1. The *"right* of trial by jury" is guaranteed without any exceptions
wherever a recovery is sought which will transfer money or property of
·one person to another by order of a court, and the amount thus sought
to be recovered depends upon issues of fact, as in this case, the value of
the services rendered, which is denied by the defendant guardian. Cons.,
Art. I, sec. 19.

2. It is "class legislation," which is forbidden by Cons., Art. I, sec. 7,
which provides that "No man or set of men are entitled to exclusive
·emoluments or privileges from the community but in consideration of
public services."

This action of the Court gives to lawyers an exclusive and valuable
privilege, for when the value of their services is to be fixed and they
cannot get the guardian, administrator or trustee to agree to the esti-
mate of counsel as to the value of their services, instead of being rele-
gated to an impartial jury of twelve men, like the doctor, the grocer,
·or the merchant, and all others having claims against the estate, they
are now held by this decision entitled to have their compensation fixed
by one of their own profession upon the bench, who naturally may have
a higher estimate of the value of legal services than a jury, and will be
indisposed to antagonize members of the profession who have been
their friends and comrades of the bar, and who may become such again
upon retirement from the bench.

Though trial by jury was not provided for in Magna Carta (for at
that time there were neither juries nor lawyers in England), juries and
lawyers were evolved in the development of judicial proceedings long
after Magna Carta and at about the same period of time. From that
time to this, lawyers have been the foremost advocates and most uncom-
promising supporters of "trial by jury" in the ascertainment of all dis-
puted matters of fact, and opposed to leaving them to the decisions of
judges, who, in this State, have been forbidden since 1796 even to
·express an opinion upon the facts. Laws 1796, ch. 452; Revisal, 535.

Having spent my life in the ranks of the legal profession, I view
with alarm this innovation which it seems to me likely to revive much
·of the·hostility to the profession on account of the privilege thus given
it by judicial, and not by statutory, enactment. In the first Constitution
for this State (Locke's Fundamental Constitutions, sec. 70, to be found
2 Revised Statutes of 1839, p. 459) it was provided: "It shall be a base
and vile thing to plead for money or reward," and further provided that
no one except a near kinsman, not further off than cousin germane to
the party concerned, shall be permitted to plead another man's cause,
.and unless he first should take an oath in each case that he has not

received, and will not receive, directly or indirectly, money or other reward for pleading the cause.

Laws 1801, ch. 12, sec. 3, continuing in force the act creating our first court of appeals, the "Court of Conference," which was the original of the present Supreme Court, provided: "No attorney shall be allowed to speak, or be admitted as counsel, in the aforesaid Court." And a later act, known as "Potter's Act," restricted to a small sum the amount which a lawyer could agree upon to be paid by any client. Happily, we have outlived those days of unreasoning prejudice against the profession, and such acts have long since been repealed, lawyers being left free to fix their compensation for their services by agreement, like any one else; and, like any one else, to have them valued by a jury in cases of disagreement. By chapter 41, Laws 1879, was repealed the sole remnant of the interference of the courts which had authorized tax fees for lawyers to be assessed in the bill of costs against the losing party.

If, by this action of the Court, the right is now created that the fees of lawyers can, on their application, be fixed by the courts and judgment shall be rendered for the payment thereof, with denial of the constitutional privilege to the party who must pay them of having a jury to assess the value of the services rendered, it is to be apprehended that the special privilege thus given to them as a class will revive the feeling so quickly aroused in all free countries against "special privileges" to any one class that is denied to all others. I do not believe that my brethren of the bar will desire this. Therefore, with profound respect for the opinion of my associates, as already stated, I must enter my earnest dissent to a decision which I deem is in violation of the Constitution.

Having deemed it proper and necessary to present earnestly, though unavailingly, my opposition to this innovation in view of the troubles that will come to the judges and the public criticism of them if, without statute and without precedent, they are vested by this decision with the invidious power of fixing fees of counsel whenever a guardian or administrator is unwilling to pay the amount charged, and counsel are unwilling to submit the value of their services to be fixed by a jury, I have not thought it necessary to discuss the amount of fees which the Court shall see fit to allow in this case. But as the matter of the fee is the sole origin and motive of this proceeding, and is the only point before us, if the Court holds it has jurisdiction, I am in accord with the Court that the $1,000 allowed below is excessive for the service rendered, but I am further of the opinion that the $500 allowed here is more than such fair and reasonable sum which the ward's estate should pay, and in my judgment is an excessive tax upon the child's estate, which has already paid a fee of $500. There is no disputed fact and only one single simple question of law, with no complication. See the opinion In re Stone, 173 N. C., 210, 212.

As to the adjudication of costs against the guardian personally for resisting this motion to order the guardian to pay $1,000 fees claimed by plaintiffs, it would seem that it was clearly her duty as guardian to oppose the allowance of a fee against her ward's estate in her hands of $1,000 or any other amount which she might deem excessive; and as this Court has adjudged that such sum is double what ought to have been allowed, the costs of the appeal should be paid by the plaintiffs. Rev., 1279; McLean v. Breece, 13 N. C., 393.

Even if the costs, or any part, were adjudged against the defendant, it should be adjudged against the ward's estate in her hands, for whose protection she took this appeal. She was not acting for herself, but for her ward (and her only child) in endeavoring to protect his estate from what she deemed an excessive charge. The Court has adjudged her contention correct. The $500 which she is ordered to "pay into court" will be paid solely out of the ward's estate, as the whole $1,000 would have been but for her provident action in appealing to this Court. Why should she be punished for the faithful discharge of her duty as guardian by being taxed personally with the costs? She is not a defendant individually, but as guardian. The costs should be taxed against the plaintiffs, who have had their "recovery" reduced one-half.